UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TAMMY M., ) <br> ) <br>     **Plaintiff,** ) <br> ) <br>     v. ) <br> ) <br> KILOLO KIJAKAZI, Acting Commissioner, ) <br> Social Security Administration, ) <br> ) <br>     **Defendant.** ) <br> ) | Civil Action No. <br> 22-10949-FDS |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
FOR ORDER REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S
MOTION FOR ORDER AFFIRMING THE COMMISSIONER'S DECISION**

**SAYLOR, C.J.**

This is an appeal from the final decision of the Commissioner of the Social Security Administration denying an application for supplemental security income ("SSI") benefits. Plaintiff Tammy M. alleges that she became disabled on July 8, 2016, after various impairments rendered her unable to work. She submitted medical records indicating that she suffers from various ailments, including attention deficit/hyperactivity disorder ("ADHD"), generalized anxiety disorder, major depressive disorder, osteoarthritis, post-traumatic stress disorder ("PTSD"), headaches, and pain in her neck and back. She now disputes the Commissioner's holding that she is not "disabled" within the meaning of the Social Security Act.

Pending before the Court is plaintiff's appeal and the Commissioner's motion to affirm. For the reasons stated below, plaintiff's motion to reverse and remand will be denied, and the Commissioner's motion to affirm will be granted.

**I.     Background**

The following is a summary of the evidence as set forth in the administrative record ("A.R.").

   **A.     Educational and Occupational History**

Plaintiff was born on January 3, 1982, and is currently 41 years old. (*See* A.R. at 59). She was 34 years old at the alleged onset of her disability on July 8, 2016. (*Id.* at 57).

Plaintiff dropped out of school in the ninth grade. (*Id.* at 61). She last worked from 2010 to 2013, doing errands for a friend. (*Id.* at 65). She has no relevant past work experience before 2010. (*Id.* at 65-66).

   **B.     Medical History**

Plaintiff alleges that she is unable to work due to various physical and mental-health impairments. (*Id.* at 58).

Dr. Richard Ober, Ph.D., a psychologist, treated plaintiff from October 28, 2013, through December 22, 2017. (*See id.* at 116, 362). He noted that she experienced panic attacks or increased anxiety while standing in line, driving, spending time with her parents, and generally when leaving home. (*Id.* at 368, 372, 381-85). As of July 29, 2016, he noted that she had been prescribed Lorazepam and Buspirone for anxiety, and Concerta for ADHD. (*See id.* at 372).

On June 18, 2018, plaintiff saw Dr. Andrew Willment, M.D., her primary-care provider. (*Id.* at 486). She reported that Amitriptyline decreased the frequency of her migraines, but that she still had them during her menstrual cycle. (*Id.*).

On May 23, 2019, plaintiff had a follow-up appointment with Dr. Willment. (*Id.* at 475). She reported that her neck pain and headaches were "improving with seeing a chiropractor," but that she had "been getting worse and feeling terrible." (*Id.*). He referred her to a neurologist. (*Id.* at 477).

On June 11, 2019, plaintiff saw Dr. Jayalekshmy Kumar, M.D., a neurologist, for migraines and chronic neck and back pain. (*Id.* at 442). He reported that she described having headaches that occurred several times a week, and involved photophobia, phonophobia, nausea, and vomiting. (*Id.*). They began in the neck and radiated to the occipital region. (*Id.*). He prescribed Topamax and indicated that he would refer her to physical therapy if her neck pain did not improve. (*Id.* at 444).

On July 25, 2019, plaintiff saw Dr. Willment. (*Id.* at 472). He prescribed Concerta, which she had stopped taking in late 2018, and reported that she was not tolerating Topamax and would follow up with neurology. (*Id.*). The record does not indicate that she sought further treatment with a neurologist.

On May 19, 2020, plaintiff had a telehealth visit with Dr. Willment. (*Id.* at 501). He noted that her migraine headaches were very rare and were being managed by "cutting down on meds and caffeine," but that she was experiencing difficulty managing her neck and back pain without massages. (*Id.*). He diagnosed cervicalgia and referred her to physical therapy for her lower-back pain. (*Id.* at 505-06).

      C.      **<u>Additional Medical Examinations or Opinions</u>**

On September 6, 2019, Dr. Uma P. Chelvan, M.D., performed a physical residual functional capacity ("RFC") assessment. (*Id.* at 134-35). As to plaintiff's exertional limitations, she concluded that she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. (*Id.* at 134). As to her postural limitations, she concluded that she could occasionally stoop. (*Id.*). She concluded that she had no manipulative limitations. (*Id.* at 135).

3

On September 26, 2019, Dr. David Ingle, a clinical psychologist, conducted a consultative examination. (*Id.* at 459-64). He indicated that plaintiff was suffering from moderate major depressive disorder and arthritis. (*Id.* at 462). She described feeling "pretty sad and anxious" and having "very poor motivation," but stated that she was no longer seeing a therapist. (*Id.* at 460-61). He reported that her "frustration tolerance is pretty high," and that she could "tolerate sustained contact with the general public, by her own account." (*Id.* at 462-63). Her capacity "to understand, remember and follow directions for two hours at a time over eight hour days . . . may be somewhat impaired due to concentration issues." (*Id.* at 463). He further opined that her "ability . . . to do work-related activities . . . may not be limited." (*Id.*).

On October 21, 2019, Dr. Julie Cohen, Ph.D., a psychologist, performed a mental RFC assessment. (*Id.* at 135-37). She concluded that plaintiff was moderately limited in her ability to concentrate, but that her concentration and memory "were intact." (*Id.* at 136). She also found that she was moderately limited in her ability to respond to workplace changes. (*Id.*). She further noted that she could sustain attention for simple tasks for 2 hours at a time, for an 8-hour day, during a 40-hour week. (*Id.* at 137).

On January 24, 2020, John J. Warren, Ed.D., performed a mental RFC assessment. (*Id.* at 167-69). While Dr. Cohen had concluded that plaintiff did not have any understanding or memory limitations, Warren found that she was moderately limited in her ability to understand and remember detailed instructions. (*Id.* at 135, 167). However, he noted that she was able to understand and remember simple directions. (*Id.* at 167). In addition, Warren concluded that she did have certain social interaction limitations. (*Id.* at 168). Specifically, he found that while she could sustain the basic demands associated with relating adequately with supervisors and coworkers, she should have limited contact with the general public. (*Id.*).

On February 1, 2020, Dr. Swaran Goswami, M.D., performed a physical RFC assessment. (*Id.* at 165-67). Overall, she agreed with Dr. Chelvan's RFC assessment, but identified several additional exertional, postural, and manipulative limitations. (*See id.*).

### D.     Hearing Testimony

Plaintiff testified by telephone at a remote hearing before the Administrative Law Judge ("ALJ") on November 23, 2020. (*Id.* at 52-97). She contended that various impairments have rendered her unable to work. She testified that she has neck and back pain and finds it difficult to stay focused. (*Id.* at 66). She stated that the pain sometimes results in headaches and prevents her from "mov[ing] [her] head very well." (*Id.* at 69). She testified that she can only stand or sit for a short while before doing so becomes painful, and that she spends most of the day lying down. (*Id.* at 70). If she reads anything more than a sentence, she is "prone to get headaches." (*Id.* at 79).

Plaintiff testified that she had been receiving chiropractic treatment one to three times a week until a COVID-related closure in March 2020. (*Id.* at 67-68). She resumed chiropractic therapy three times a week in the months preceding the remote hearing, but testified that the various treatments had "[n]ot really" been helpful. (*Id.* at 67-69).

As to her daily activities, plaintiff testified that her children's father gets their two children ready and brings them to and from school. (*Id.* at 72). He gives her dinner, or she microwaves food, because she has trouble standing over a pot to cook. (*Id.* at 72-73). She also stated that she cannot do any dishes or laundry due to her inability to bend or stoop, and that she showers once every four days because she "can't always seem to get in." (*Id.*). She further noted that she gets anxious when "driving or . . . walking around or . . . around other people." (*Id.* at 71).

Plaintiff indicated that she has recovered from a heroin addiction, despite relapsing in

5

2020.  (*Id.* at 75).  She testified that she receives drug counseling and takes 20 milligrams of methadone daily, and that she has not relapsed since.  (*Id.*).

The ALJ asked the vocational expert if there were any jobs in the economy for someone who had the physical capacity for light work and who would be unable to climb ropes, ladders, or scaffolds; could only occasionally stoop; could frequently, but not constantly, reach in all directions; would only be able to understand, remember, and carry out simple and routine instructions in a workplace free of fast-paced production requirements and involving only simple work-related decisions; could interact occasionally with the general public, and superficially with coworkers and supervisors; and could adapt to few, if any, workplace changes.  (*Id.* at 83).  The vocational expert testified that there were the following jobs available in the economy:  bottle packer, marker, and silver wrapper.  (*Id.* at 84).  The ALJ further asked if the same jobs would be available to someone of the same description but who could only reach in all directions occasionally, instead of frequently.  (*Id.*).  The vocational expert testified that that restriction would limit such a person to the following two jobs in the economy:  investigator/dealer accounts and surveillance system monitor.  (*Id.* at 84-85).  The vocational expert further testified that no more than five percent of time off-task, in addition to scheduled breaks, would be tolerated.  (*Id.* at 87).

E.   **Procedural History**

On June 12, 2019, plaintiff applied for SSI benefits, alleging that she became disabled on July 8, 2016.  (*See id.* at 57, 245).[1]  The Commissioner denied her claim both initially on October 22, 2019, and upon reconsideration on February 20, 2020.  (*Id.* at 194-96, 202-04).

---

[1] Although her application listed an alleged onset date of August 12, 2014, plaintiff later amended that date. (*See id.* at 57, 246).

6

Thereafter, she filed a written request for a hearing on February 28, 2020. (*Id.* at 37). The hearing was held on November 23, 2020. (*Id.* at 52-97). Plaintiff, who was represented by counsel, appeared remotely and testified at the hearing. (*Id.*). Helene Feldman, a vocational expert, also testified. (*Id.*).

On March 31, 2021, the ALJ concluded that plaintiff is not disabled. (*Id.* at 47). She requested a review of the ALJ's decision. (*Id.* at 240-42). On April 14, 2022, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner. (*Id.* at 1-4). This appeal followed.

## II.     Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001); *see Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987). Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision if the ALJ ignored evidence or made legal or factual errors. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D.

Mass. Mar. 2, 2013) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision . . . ." (citation omitted)). Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation."). Questions of law are reviewed de novo. *Seavey*, 276 F.3d at 9.

B.  **Standard for Entitlement to SSI Benefits**

In order to qualify for SSI, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. 42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (setting forth the definition of "disabled" in the context of SSI). "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe enough to prevent the claimant from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

The Commissioner uses a sequential five-step process to evaluate whether a claimant is disabled. *See Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); 20 C.F.R. § 416.920. Those steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual

8

functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 416.920(a)(4). "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether he or she can engage in any kind of substantial gainful work that exists in the national economy. 20 C.F.R. §§ 416.920(g), 416.960(c).

  C. **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the established five-step procedure set forth in 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since July 8, 2016, the alleged onset date." (A.R. at 40).

At step two, the ALJ addressed the severity of plaintiff's impairments. He concluded that she has the following severe impairments: osteoarthritis of the cervical spine, lumbar spine disorder, carpal tunnel syndrome, migraine headaches, major depressive disorder, generalized anxiety disorder, ADHD, and PTSD. (*Id.*). Those impairments significantly limited her ability to perform basic work activities as required by SSR 85-28. (*Id.*).[2]

---

[2] The ALJ noted that while plaintiff has a history of substance abuse disorder, she is on methadone maintenance, and the impairment is non-severe. (*Id.*).

9

At step three, the ALJ found that those severe impairments, or their combination, did not meet or medically equal the severity of the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, App'x 1. (*Id.*). The ALJ stated that plaintiff's "physical impairments, considered singly or in combination, . . . have not met the clinical requirements" of any listed impairment. (*Id.*). The ALJ further stated that her "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, 12.11, and 12.15," and noted that, "[i]n making [that] finding, the undersigned has considered whether the 'paragraph B' criteria [were] satisfied." (*Id.*).

"To satisfy the paragraph B criteria, [the] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, App'x 1, 12.00 Mental Disorders. Those four areas are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.*

The ALJ concluded that the "paragraph B" criteria were not met because plaintiff had only a moderate limitation for understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (A.R. at 41). In addition, he found that she did not satisfy the "paragraph C" criteria because the "medical record demonstrates that [she] has not engaged in mental health treatment with a licensed mental health professional for much of the adjudicative period." (*Id.* at 42).

At step four, the ALJ determined that plaintiff did not have any past relevant work under 20 C.F.R. § 416.965. (*Id.* at 46).

After consideration of the record, the ALJ concluded that plaintiff had the residual functional capacity to perform light work, although she cannot climb ropes, ladders, or scaffolds

and can only occasionally stoop. (*Id.* at 42). She can do "simple, routine, repetitive tasks in a work environment free of fast-paced production requirements." (*Id.*). She can only interact occasionally with the public, and superficially with coworkers and supervisors. (*Id.*). She can adapt to few, if any, workplace changes. (*Id.*).

In making that finding, the ALJ followed a two-step process. (*Id.*). First, he considered whether there were underlying medically determinable physical or mental impairments—that is, impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce her pain or other symptoms. (*Id.* at 42-43). Second, he evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limited her work-related activities. (*Id.* at 43). For that purpose, whenever statements about those symptoms were not substantiated by objective medical evidence, the ALJ considered other evidence in the record to determine if the symptoms limited her ability to perform work-related activities. (*Id.*).

At the first step, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.*). However, at the second step, he found that her statements about the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical evidence and other evidence in the record. (*Id.*). Specifically, he found that her statements at the hearing were inconsistent with her reported abilities during consultative examination and on her function report, and the fact that she indicated that she gets along well with friends, neighbors, family, and coworkers. (*Id.* at 44-45).

In making those determinations, the ALJ stated that he did not defer to or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions. (*Id.* at 45). He found the opinions of the state agency medical and

11

psychological consultants to be "persuasive," as they were "consistent with and supported by the record as a whole." (*Id.*). He noted that he found the limitations given by Dr. Ingle in his assessment of paragraph B criteria "generally persuasive" in view of plaintiff's adult function report and mental status examinations. (*Id.*). Overall, he found that the RFC assessment was supported by the conclusions of Drs. Ingle, Cohen, Chelvan, Goswami, and Warren, and that their conclusions were supported by the medical evidence. (*See id.*).

At step five, the ALJ considered plaintiff's age, education, work experience, and RFC. Taking all of those factors into account, the ALJ found that a significant number of jobs existed in the national economy that she could perform. (*Id.* at 46); *see also* 20 C.F.R. §§ 416.969, 416.969a. To determine the extent to which her limitations impeded her ability to perform unskilled light work, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with her age, education, work experience, and RFC. (A.R. at 46). The vocational expert testified that a person with her characteristics could work in representative occupations such as a bottle packer or merchandise marker. (*Id.*). The ALJ concluded that after considering her characteristics, she could make a successful adjustment to work that exists in significant numbers in the national economy, and that she was not disabled within the meaning of the Social Security Act. (*Id.* at 47).

### D.     **Plaintiff's Objections**

Plaintiff raises two main objections to the ALJ's determination that she is not disabled: (1) that the ALJ failed to properly assess her migraines and her symptoms, and (2) that the ALJ improperly evaluated opinion evidence.

1. **Failure to Assess the Evidence**

   a. **Listing 11.02(B):  Dyscognitive Seizures**

Plaintiff first contends that the ALJ failed to cite SSR 19-4p—which provides guidance on evaluating primary headache disorders—or explicitly consider whether the sum of her migraines and cervicogenic headaches could have qualified her as "disabled" under Listing 11.02(B).[3]  However, an ALJ's failure to cite an applicable SSR "does not establish reversible error in the absence of any showing that the decision is materially inconsistent with the regulation."  *Begin v. Saul*, 2021 WL 4177687, at *4 (D.N.H. Sept. 14, 2021) (quoting *Diaz v. Acting Com'r*, 2015 WL 5331285, at *2 (D.N.H. Sept. 14, 2015)).  In addition, "[a]n ALJ's failure to address a specific listing or to elaborate on [his] conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion."  *Monteiro v. Saul*, 2022 WL 867988, at *5 (D. Mass. Mar. 23, 2022) (quoting *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017)).

Here, substantial evidence exists to support the ALJ's decision.  That includes, for example, plaintiff's statements in May 2020 to her primary-care provider that her migraines were "very rare" and were being managed by "cutting down" on medications and caffeine.  (A.R. at 501).  In addition, she did not follow Dr. Kumar's recommended follow-up treatment for her headaches.  (*Id.* at 43).[4]  Accordingly, the record does not suggest that plaintiff's migraines were equivalent in severity to an alteration of consciousness, as required for a finding of dyscognitive

---

[3] Listing 11.02(B) concerns dyscognitive seizures, which are characterized as causing an alteration of consciousness and occurring despite adherence to prescribed treatment.  20 C.F.R. Part 404, Subpart P, App'x 1 § 11.00H1b-H4d.

[4] Dr. Kumar had prescribed Topamax and indicated that he would refer plaintiff to physical therapy if her headaches did not improve.  (A.R. at 533).  Although she did not tolerate Topamax, she did not follow up with him or any other neurologist for additional treatment.  (*Id.* at 472).

seizures, and, in any event, such seizures will typically not be counted "during a period when [the claimant is] not adhering to prescribed treatment." 20 C.F.R. Part 404, Subpart P, App'x 1 § 11.00H4d.

Accordingly, the ALJ's failure to explicitly discuss Listing 11.02(B) is not a cause for remand. *See Perez Torres v. Secretary of Health & Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989) (holding ALJ's error harmless where the record supports ALJ's conclusion); *Ward*, 211 F.3d at 656 (noting remand not essential where it would amount to empty explanatory exercise for ALJ).

### b. RFC Limitations Attributable to Migraines

Plaintiff next contends that the ALJ failed to account for RFC limitations attributable to migraines. An ALJ's determination of a claimant's RFC must be supported by substantial evidence. *Seavey*, 276 F.3d at 9. Substantial evidence means that there is "more than a mere scintilla" of evidence, such that a reasonable mind could accept the evidence as "adequate to support" the ALJ's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." *Berrios Lopez v. Secretary of Health & Human Servs.*, 951 F.2d 427, 430 (1st Cir. 1991). An ALJ's conclusion as to RFC must be supported by a "medical opinion" to be supported by substantial evidence. *See Chater*, 172 F.3d at 35 ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *see also Beyene v. Astrue*, 739 F. Supp. 2d 77, 83 (D. Mass. 2010) (holding that an ALJ's "determination of a claimant's RFC made without any assessment of RFC by an expert is unsupported by substantial evidence and must be remanded to obtain further functional evidence"). A medical opinion is a statement from a

14

medical source about what an individual can do despite his or her impairments. 20 C.F.R. § 404.1513(a)(2).

Plaintiff asserts that the ALJ failed to consider that plaintiff's migraines would cause absenteeism, which would not be tolerated by an employer. Unlike in *Sacilowski v. Saul*, 959 F.3d 431 (1st Cir. 2020), a case cited by plaintiff, the record here contains no medical opinion evidence that suggests expected absenteeism due to migraine headaches. To the contrary, plaintiff's primary-care physician noted in May 2020, that her migraines were "very rare" and "managed." (A.R. at 501). In addition, the ALJ noted that she did not require aggressive treatment, such as nerve blocks, Botox injections, or frequent emergency room visits, to address her condition. (*Id.* at 43). Nor did she pursue physical therapy or follow up with a neurologist when she did not tolerate Topamax. (*See id.* at 444, 472).

Thus, the ALJ did not disregard evidence of functional limitations due to plaintiff's migraine headaches or neck and back pain. *See Callahan*, 997 F. Supp. at 183; *see also Crosby*, 638 F. Supp. at 385-86. Rather, he explicitly considered the medical record and reasonably concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence." (A.R. at 43).

### 2. Medical Source Opinions

#### a. Dr. Richard Ober, Ph.D.

Plaintiff next asserts that the ALJ improperly rejected the medical opinion of Dr. Ober.

Under § 404.1520c, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." When determining what weight to assign to a medical source opinion, the ALJ must consider the opinion's "supportability, consistency, relationship, specialization, and other factors." *Harrison v. Saul*,

15

2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5)).  "The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate."  *Id.*  "ALJs must consider the persuasiveness of all medical opinions in a claimant's case record and need not defer to the medical opinions of a claimant's treating physicians."  *Id.* (citing 20 C.F.R. § 404.1520c).  This means that a "medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  *Id.* (quoting REVISIONS TO RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. at 5854).  "An ALJ's decision to accord a treating physician's opinion with little weight will be sustained on review so long as one of the reasons given by the ALJ is proper and adequately supported."  *Id.* at *6.

Here, the ALJ provided appropriate reasons for not giving controlling weight to Dr. Ober's opinions.[5]  Specifically, he explained that "Dr. Ober's notes are not supported by the degree of limitation he opined."  (A.R. at 44).

In May 2016, Dr. Ober indicated that plaintiff "is plagued by severe anxiety and panic attacks," "has a profound fear of people," and "has been terminated because she was required to be told on a number of occasions how to do a fairly simple task."  (*Id.* at 370).

However, in July 2019, plaintiff indicated that she has never been fired or laid off from a job because of problems getting along with other people, and that she gets along "fine" with

---

[5] As a preliminary matter, it is far from clear whether Dr. Ober's conclusions constitute a "medical opinion."  *See, e.g.*, *Jenkins v. Kijakazi*, 2022 WL 357185, at *3 (W.D. Mo. Feb. 7, 2022) ("[T]his is not a medical opinion because it contains a list of symptoms and does not purport to describe Plaintiff's functional abilities . . . ."); *Michael H. v. Saul*, 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021) (holding that doctor's progress note was not a "medical opinion" because "it does not address what Plaintiff is capable of doing in spite of his limitations, nor does it discusses Plaintiff's limitations with any specificity").  In any event, because the ALJ analyzed the supportability and consistency factors with respect to Dr. Ober's reports, he did at least as much as was required under the regulatory framework.

authority figures such as bosses. (*Id.* at 313). Similarly, in September 2019, she reported that she "gets along well with co-workers and bosses when she does work." (*Id.* at 461). Finally, other professionals who examined plaintiff during that period described her as having euthymic affect and no evidence of language, attention, or memory deficits. (*See, e.g.*, *id.* at 443, 459-62). Accordingly, the ALJ provided sufficient support for discounting Dr. Ober's opinion based on inconsistencies within the record.

### b. Dr. David Ingle, Psy.D.

Plaintiff next contends that the ALJ failed to incorporate disabling restrictions identified in Dr. Ingle's examination report. Contrary to what plaintiff asserts, however, Dr. Ingle did not report that she "would" be somewhat impaired due to concentration issues. (*See* Pl.'s Brief at 18-19). Rather, he stated that her capacity "to understand, remember and follow directions for two hours at a time over eight hour days . . . *may* be somewhat impaired due to concentration issues." (A.R. at 463 (emphasis added)). And, as noted, he further cautioned that "[h]er ability, despite her impairments, to do work-related activities on a consistent reliable basis *may not be limited* by these issues." (*Id.* (emphasis added)). Accordingly, the ALJ was not required to include that restriction in his RFC assessment.

### c. State Agency Medical Opinions

Finally, plaintiff contends that the ALJ improperly ignored inconsistencies between the state agency reports of Dr. Cohen and Warren. Specifically, while Dr. Cohen had concluded that she had no understanding, memory, or social limitations, Warren concluded that she did have such limitations. (*Id.* at 135-36, 167-68). However, the ALJ stated that the opinions were "consistent with and supported by the record as a whole," not that they were completely consistent with one another. (*Id.* at 45). In addition, even assuming that their findings were materially inconsistent, plaintiff cannot show harm where, as here, the ALJ adopted the more

17

restrictive conclusions of Warren.  *See Yearling v. Colvin*, 292 F. Supp. 3d 515, 520 (D. Mass. 2017) ("[T]he ALJ did not commit reversible error in assigning [the claimant] a more restrictive RFC.").

### III.     Conclusion

For the foregoing reasons, plaintiff's motion to reverse and remand the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion to affirm the action of the Commissioner is GRANTED.

**So Ordered.**

Dated:  August 21, 2023

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court